UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
GALVESTON DIVISION

| | | |
|---|---|---|
| WILLIAM DEXTER WHITE, TDCJ # 00545599, | § § § | |
| Plaintiff, | § § | |
| VS. | § | CIVIL ACTION NO. 3:18-CV-0017 |
| CECILIA OKEYE, *et al*, | § § § | |
| Defendants. | § § | |

## MEMORANDUM OPINION AND ORDER

Plaintiff William Dexter White, an inmate at the Texas Department of Criminal Justice–Correctional Institutions Division ("TDCJ"), proceeds *pro se* and has been granted leave to proceed *in forma pauperis*. As ordered by the Court, Plaintiff filed an amended pleading (Dkt. 19). Because White is a prisoner proceeding *in forma pauperis*, the Court is required by the Prison Litigation Reform Act ("PLRA") to scrutinize the pleadings. The Court must dismiss the case, in whole or in part, if it determines that the action is frivolous, malicious, fails to state a claim upon which relief may be granted, or "seeks monetary relief against a defendant who is immune from such relief." 28 U.S.C. § 1915A, § 1915(e)(2)(B). After reviewing all of the pleadings and the applicable law, the Court concludes that this case must be **DISMISSED** for the reasons that follow.

### I. BACKGROUND

#### A. Procedural Background

Plaintiff originally filed this civil rights action in 2005 in the Eastern District of Texas, Civil Action No. 6:05-0026. On October 21, 2014, the court for the Eastern

District severed some of White's claims and transferred them to this Court (Dkt. 1). After the Court instructed him to cure pleading deficiencies (Dkt. 13), Plaintiff filed an amended pleading (Dkt. 19) on December 19, 2014.

On January 18, 2018, the Court severed Plaintiff's claims into two civil actions, Civil Action No. 3:14-333 and Civil Action No. 3:18-0017. Civil Action No. 3:14-333 consisted of Plaintiff's claims that Defendants Nix, Mayes, and Cooper used excessive force against him in 2003. On June 13, 2018, the Court dismissed Civil Action No. 3:14-333 on Plaintiff's motion.

Civil Action No. 3:18-0017 is the case at bar. As set forth in the severance order (Dkt. 25, at 2-3),[1] this case consists of two sets of claims: (1) Plaintiff's claim that six Defendants on the Darrington Unit classification committee (V. Dodson, J. O'Guinn, Susan Ballie, B. Horn, Herman Weston, and A. Velasquez) failed to protect him after he was transferred in from the Michael Unit in early 2003, which allegedly led to an assault on Plaintiff by another inmate in September 2004, and (2) Plaintiff's claim that four Defendants (Cecilia Okeye, Owen Murray, Steven Smock, and an unnamed medical defendant) failed to provide him with adequate medical care for his injuries after the September 2004 assault.

**B.    Factual Background**

The relevant facts, as alleged in Plaintiff's amended complaint (Dkt. 19), are as follows: On or about April 5, 2003, Plaintiff arrived at the Darrington Unit from the

---

[1]    Throughout this Memorandum, the Court's citations to specific pages in the record refer to the pagination of docket entries on the Court's electronic case filing ("ECF") system

Michael Unit. Plaintiff had been in "safekeeping" at the Michael Unit. He states that after he was convicted of the disciplinary infraction of attempted extortion on December 30, 2002, prison officials "used" the conviction to "remove [him] from safekeeping and subsequently transfer [him] to the Darrington Unit" (Dkt. 19, at 25; *see* Dkt. 19-3, at 29 (disciplinary record); Dkt. 19-3, at 25-28 (grievance regarding disciplinary case)).

After arriving at the Darrington Unit, Plaintiff informed Defendant Horn, whom he identifies as the "ranking officer over classification" at Darrington, that he would have "serious problems" with gang members at the unit (Dkt. 19, at 11). In particular, Plaintiff informed Horn that he had been branded a "snitch" due to his cooperation with criminal prosecutions of other inmates and previously had been brutally assaulted by a member of the Aryan Brotherhood (*id*.). Plaintiff requested that Horn put him "back on safekeeping," as he had been at the Michael Unit, but Horn stated that Plaintiff's disciplinary conviction prevented Horn from granting the request (*id*.).

In August and September 2003, Plaintiff filed three grievances complaining that his life was in danger from other inmates at the Darrington Unit due to gang affiliations and racial tensions (Dkt. 19-3, at 1-4; *id*. at 5-8; *id*. at 9-12). Plaintiff complained that he was mishoused and unprotected from prison gangs. He also claimed that another inmate known as "Ponyboy" could provide prison officials with evidence regarding the danger Plaintiff faced. In response, TDCJ officials stated that unit administration had investigated his claim, that the claim had no merit and was unsupported by evidence, and that the grievance officials would defer to the housing decision by the classification committee (Dkt. 19-3, at 4, 8, & 12).

In September 2003, at the time Plaintiff's grievances were under consideration, officials at the Darrington Unit conducted an offender protection investigation ("OPI") based on Plaintiff's request for protection from gang activity. The OPI records, which Plaintiff submitted along with his complaint (Dkt. 19-3, at 14-20), indicate that the investigation began on September 5, 2003 in response to an incident on September 4, 2003 (*id*. at 14). The report attaches a lengthy record of an official's interview with Plaintiff on September 8, 2003, which details Plaintiff's past conflicts with other inmates, his prior disciplinary case, and his prior placement on "safekeeping" (*id*. at 15-16). In the interview, Plaintiff stated that his conflicts from the Michael Unit had followed him to the Darrington Unit and that he had a reputation as a snitch (*id*. at 17-18). He told the interviewer that Ponyboy could provide information "about what [Plaintiff] did on the Michael Unit" (*id*. at 18). He claimed that his line at the Darrington Unit was currently locked down and that he had heard other inmates saying that they would "get all the snitches" as soon as lockdown lifted (*id*. at 17-18). However, Plaintiff did not know the identity of the inmates he had heard and could not identify anyone who was threatening him (*id*.).

The investigator's summary, dated September 10, 2003, stated that Plaintiff described his enemies as "White, Hispanic, or black" and claimed that they were "everywhere on th[e] unit," but had "successfully avoid[ed] identifying any specific person(s)" (*id*. at 19). The investigator noted that Plaintiff had offered "one possible witness," Ponyboy, but that "the act of questioning [Ponyboy] would give [Plaintiff] ammunition to claim that staff has endangered his life" (*id*. at 19). *See id*. at 14 (OPI

investigation form states that other offenders were not interviewed because "[i]nvolvement of other inmates would jeopardize complainant"). The investigator concluded that "[Plaintiff's] conclusions of life endangerment are solely based on his assumptions and not on any one act, or acts, towards him by any person(s) on this unit" (*id*. at 19). At a classification hearing the next day, on September 11, 2003, Plaintiff's request for a transfer was denied with the notation, "no evidence" (*id*.).

Plaintiff alleges that approximately one year later, on September 20, 2004, he was viciously assaulted by another inmate at the Darrington Unit who was a prison gang member (Dkt. 19, at 3). He claims that the denied transfer in 2003 amounted to a failure to protect him from the 2004 assault. Plaintiff appears to allege generally that all six Defendants from the classification committee "mishoused" Plaintiff upon his arrival at the Darrington Unit in April 2003 and failed to respond properly to his request for protection in 2004. Regarding Defendants Horn and O'Guinn, Plaintiff alleges that each failed to adequately investigate the protection issue by failing to interview Ponyboy during the OPI investigation (Dkt. 19, at 11-12). As for other Defendants who were members of the classification committee (Defendants Dodson, Ballie, Weston, and Velasquez), Plaintiff makes no specific allegations, despite the Court's previous instructions to state "how <u>each</u> person was <u>personally involved</u> in the harm suffered by plaintiff" (Dkt. 13, at 2). Rather, he alleges that "each" committee member had a responsibility to review Plaintiff's classification file before rendering a decision and that the file contained evidence indicating that Ponyboy's testimony would be relevant to the decision. On that basis, he alleges that each committee member "refused" to interview

Ponyboy and improperly denied Plaintiff a transfer, which "resulted in Plaintiff being the victim of a vicious brutal attack" one year later in September 2004 (Dkt. 19, at 14).

Plaintiff's left sinus cavity and left jaw were "crushed" and severely swollen in the September 2004 assault (*id*. at 2-3). He alleges that he was taken to the infirmary and "blood was steadily dripping from his nose and eye" but that he was "sent back to his cell with no pain medication" (*id*. at 2). Two days later, on or about September 22, 2004, he received x-rays and spoke remotely with an unknown doctor at John Sealy Hospital, part of the University of Texas Medical Branch ("UTMB"). He then was transported to UTMB, apparently on the same day, where additional x-rays and an MRI examination "verified the cheek was crushed and jaw fractured" (*id*.). Plaintiff attaches some of his medical records from his emergency room visit, which refer to facial trauma and a "blowout fracture." *See* Dkt. 19-1, at 6 (medical personnel note obvious deformity of nose and facial trauma); *id*. at 7 (x-ray report records "[f]oreign body in interior right orbit possibly secondary to old surgery and evidence of acute blowout fracture in right orbit"). Plaintiff was instructed to follow up with an ear, nose, and throat ("ENT") doctor and with optometry (*id*. at 6, 8-9).

Plaintiff claims that, during his hospitalization, unnamed medical personnel told him that "corrective surgery" would be scheduled "within two days" and that "'his cheek and jaw would be fixed," but that he "mysteriously" was released several days later without corrective surgery (Dkt. 19, at 2). He was discharged with no pain medication, despite having been prescribed Tylenol 3 while at the hospital (*id*. at 3). He states that he

was instructed to ask for non-prescription Tylenol at the Darrington Unit's pill window but that non-prescription Tylenol is "totally worthless for acute pain and suffering" (*id*.).

Plaintiff supplies copies of several sick call slips he submitted at the Darrington Unit in September and October 2004 that requested pain medication and repair of his fractured bones (Dkt. 19-1, at 10-19). Prison officials' responses informed him that he was awaiting appointments with optometry and the ENT clinic. In response to his requests for different pain medication, prison officials instructed him to complete his course of Motrin in accordance with protocol (*id*. at 17).

On September 30, 2004, Plaintiff saw Dr. Cecilia Okeye, a Defendant in this action. Plaintiff alleges that Okeye informed him at the appointment that "UTMB" had "refused" to repair his cheek or jaw (Dkt. 19, at 2). He claims that this refusal by UTMB caused his facial bones and teeth to be misaligned, resulting in severe chronic pain (*id*.).

On October 29, 2004, Plaintiff received treatment at the ENT clinic (Dkt. 19-1, at 20). The records from his ENT appointment, which Plaintiff attached to his complaint, indicate that Plaintiff had multiple nasal fractures but no visual symptoms and minimal cosmetic deficit. The physician, who is not identified in the record, recommended against surgery, stating, "No repair indicated @ this time" (*id*.).[2]

Plaintiff complains that Owen Murray, whom he identifies as the director of UTMB, and Steven Smock, whom he identifies as Assistant Medical Director of UTMB, are liable for his medical condition because they had decision-making authority and denied him corrective surgery (Dkt. 19, at 3-4). Plaintiff also alleges that other

---

[2] Plaintiff also received treatment at TDCJ's eye clinic on October 5, 2004 (*id*. at 14).

physicians, "unknown and unnamed," denied him corrective surgery and denied him pain medications after discharge, and that the physicians' names can be revealed through discovery. He pleads no additional relevant facts (Dkt. 19, at 5), despite the Court's instructions (Dkt. 13) to specifically describe the personal involvement of each Defendant.

As relief for his claims, Plaintiff seeks repair for his "cheek and jaw," as well as declaratory judgment and compensatory and punitive damages (Dkt. 19, at 26).

## II. STANDARD OF REVIEW

As required by the PLRA, the Court screens this case to determine whether the action is frivolous, malicious, fails to state a claim upon which relief may be granted, or seeks monetary relief against a defendant who is immune from such relief. *See* 28 U.S.C. §§ 1915A(b), 1915(e)(2)(B); 42 U.S.C. § 1997e(c). A district court may dismiss a complaint as frivolous "if it lacks an arguable basis in law or fact." *Geiger v. Jowers,* 404 F.3d 371, 373 (5th Cir. 2005); *Samford v. Dretke*, 562 F.3d 674, 678 (5th Cir. 2009). "A complaint lacks an arguable basis in law if it is based on an indisputably meritless legal theory. . . . A complaint lacks an arguable basis in fact if, after providing the plaintiff the opportunity to present additional facts when necessary, the facts alleged are clearly baseless." *Rogers v. Boatright*, 709 F.3d 403, 407 (5th Cir. 2013) (internal quotation marks and citation omitted).

A dismissal for failure to state a claim is governed by the same standard for Rule 12(b)(6) of the Federal Rules of Civil Procedure. *See Newsome v. EEOC,* 301 F.3d 227, 231 (5th Cir. 2002). Under this standard, the Court "construes the complaint liberally in

favor of the plaintiff," "takes all facts pleaded in the complaint as true," and considers whether "with every doubt resolved on [the plaintiff's] behalf, the complaint states any valid claim for relief." *Harrington v. State Farm Fire & Cas. Co.*, 563 F.3d 141, 147 (5th Cir. 2009) (internal citations and quotation marks omitted).

In reviewing the pleadings, the Court is mindful of the fact that Plaintiff proceeds *pro se*. "Pleadings must be construed so as to do justice." FED. R. CIV. P. 8(e). Complaints filed by *pro se* litigants are entitled to a liberal construction and, "however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers." *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (internal quotation marks and citation omitted). Even under this lenient standard a *pro se* plaintiff must allege more than "'labels and conclusions' or a 'formulaic recitation of the elements of a cause of action.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007)); *see Patrick v. Wal-Mart, Inc.*, 681 F.3d 614, 617 (5th Cir. 2012). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678 (citation omitted). Additionally, regardless of how well-pleaded the factual allegations may be, they must demonstrate that the plaintiff is entitled to relief under a valid legal theory. *See Neitzke v. Williams,* 490 U.S. 319, 327 (1989); *Geiger*, 404 F.3d at 373.

### III. **<u>DISCUSSION</u>**

Plaintiff brings claims against six Defendants on the classification committee for their alleged failure to protect him from an inmate assault. He also brings claims against four Defendants who allegedly denied him adequate medical care. Both claims arise

under the Eighth Amendment. Section 1983, 42 U.S.C. § 1983, provides a vehicle for a claim against a person "acting under color of state law," such as a state prison official, for a constitutional violation. *See Pratt v. Harris Cty., Tex.*, 822 F.3d 174, 180 (5th Cir. 2016); *Townsend v. Moya*, 291 F.3d 859, 861 (5th Cir. 2002).

### A. Official Immunity

Plaintiff sues all defendants in their official and individual capacities (Dkt. 19, at 1). A claim against a TDCJ or UTMB official in his or her official capacity is a claim against TDCJ or UTMB, and thus a claim against the State of Texas. *See Mayfield v. Tex. Dep't of Crim. Justice*, 529 F.3d 599, 604 (5th Cir. 2008). Because the Eleventh Amendment protects the states' sovereign immunity, federal courts lack jurisdiction over suits against a state for money damages unless the state has waived its immunity or Congress has clearly abrogated that immunity. *NiGen Biotech, L.L.C., v. Paxton*, 804 F.3d 389, 393–94 (5th Cir. 2015); *Moore v. La. Bd. Of Elem. And Secondary Educ.*, 743 F.3d 959, 963 (5th Cir. 2014). Texas has not waived its Eleventh Amendment immunity, and Congress did not abrogate that immunity when enacting Section 1983. *NiGen*, 804 F.3d at 394.

To the extent Plaintiff brings any claims for money damages against Defendants in their official capacities, the state is immune under the Eleventh Amendment. The claims therefore will be dismissed for lack of jurisdiction.

### B. Failure to Protect

Plaintiff alleges that six Defendants on the classification committee at the Darrington Unit violated his Eighth Amendment rights when they refused his request to

be housed in "safekeeping" and denied his request for a protective transfer. He claims that his assault by another inmate in September 2004 could have been prevented by the transfer he requested in 2003. The Court examines whether Plaintiff's claims that these Defendants failed to protect him are appropriately dismissed under 28 U.S.C. § 1915A(b) and 28 U.S.C. § 1915(e)(2)(B).

Prison officials have a constitutional duty to protect prisoners from violence at the hands of their fellow inmates. *Farmer v. Brennan*, 511 U.S. 825, 832-33 (1994); *Longoria v. Texas*, 473 F.3d 586, 592 (5th Cir. 2006). However, prison officials are not expected to prevent all inmate-on-inmate violence. *Adames v. Perez*, 331 F.3d 508, 512 (5th Cir. 2003). A showing of negligence by the official is insufficient to support Eighth Amendment liability. *Id.* at 514. Rather, prison officials are only liable under the Eighth Amendment when they are "deliberately indifferent" to a "substantial risk of serious harm." *Longoria*, 473 F.3d at 592; *Adames*, 331 F.3d at 512.

> An official acts with the requisite deliberate indifference if he is aware of an excessive risk to inmate safety and disregards that risk. In this context, an officer's awareness of the risk is evaluated subjectively. The official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists and must in fact also have drawn the inference.

*Longoria*, 473 F.3d at 592-93 (internal citations, quotation marks, and alterations omitted). If an official "reasonably responded" to a known substantial risk to the plaintiff, he or she is not liable under the Eighth Amendment, "even if the harm was ultimately not averted." *Farmer*, 511 U.S. at 844; *see Longoria*, 473 F.3d at 593. A defendant's personal involvement is an essential element of a civil rights cause of action,

meaning that there must be an affirmative link between the injury and a defendant's conduct. *Delaughter v. Woodard*, 909 F.3d 130, 136-37 (5th Cir. 2018).

In the case at bar, Plaintiff claims that Defendant Horn is liable because he was the "ranking officer over classification" and refused to place Plaintiff on "safekeeping." *See* Dkt. 19, at 11 ("Plaintiff requested to be put back on safekeeping. Horn denied it stating: 'The disciplinary case keeps me from doing that. You're going to close custody.'"). He also faults Horn and Defendant O'Guinn for the failure to adequately investigate Plaintiff's transfer request and to interview Ponyboy (Dkt. 19, at 11-12). For the other four Defendants, Plaintiff does not allege any particular action or failure to act, but rather alleges collectively that "each" committee member refused to interview Ponyboy despite his or her responsibility to review Plaintiff's classification file, which Plaintiff states contained evidence of the relevance of Ponyboy's testimony (*id*. at 14).

The OPI records, which Plaintiff attaches to his complaint, reflect that TDCJ officials at the Darrington Unit responded promptly to Plaintiff's request for protection and conducted an investigation that included an extended interview with Plaintiff (Dkt. 19-3, at 14-20). The officials then denied Plaintiff's request for protection because Plaintiff had failed to present specific information regarding the threat he faced. The OPI investigator stated that Plaintiff's "conclusions of life endangerment" were "solely based on his assumptions and not on any one act, or acts, towards him by any person(s) on this unit" (*id*. at 19). He further noted that Plaintiff had "successfully avoid[ed] identifying any specific person(s)" who had threatened him, instead claiming that his enemies were "everywhere on th[is] unit" (*id*.). Officials decided against interviewing other inmates

because of potential jeopardy to Plaintiff (*id*. at 14, 19). Based on these findings, and after a hearing, officials denied Plaintiff's request for a protective transfer because it was unsupported by the evidence (*id*. at 19).

Given these facts presented in Plaintiff's pleadings and attachments, Plaintiff fails to state a claim for relief under the Eighth Amendment. His only specific allegations are that Horn refused his request for "safekeeping" in April 2003 and that Horn and Defendant O'Guinn failed to interview Ponyboy during the OPI investigation in September 2003 (Dkt. 19, at 11-12). The documents attached to Plaintiff's pleadings demonstrate that Darrington Unit officials conducted an investigation, but that the investigation yielded no specific information supporting Plaintiff's claim. Plaintiff fails to identify a specific action or omission by any of the six Defendants that would support a claim that, when participating in the classification decision or OPI investigation, he or she was deliberately indifferent to a substantial risk of serious harm to Plaintiff. *See Farmer*, 511 U.S. at 844 (if an official "reasonably responded" to a known substantial risk to the plaintiff, he or she is not liable under the Eighth Amendment, "even if the harm was ultimately not averted"); *see also Delaughter*, 909 F.3d at 136-37 (a defendant's personal involvement is an essential element of a civil rights cause of action). Even if Plaintiff could successfully show that officials should have interviewed Ponyboy and were negligent in their decision not to do so, such a showing would be inadequate for Eighth Amendment liability. *See Adames*, 331 F.3d at 514.[3]

---

[3] Additionally, to the extent Plaintiff complains about the handling of his grievances in 2003 alleging that his life was in danger, a prisoner has no constitutional interest in having

Because Plaintiff makes no allegations that state a valid claim under the Eighth Amendment, his failure-to-protect claims will be **dismissed** for failure to state a claim upon which relief can be granted. 28 U.S.C. § 1915A(b).

### C. Medical Claims

Plaintiff alleges that Defendants Okeye, Murray, Smock, in addition to unknown medical defendants, violated his right to adequate medical care. The Court examines whether Plaintiff's claims against these Defendants are appropriately dismissed under 28 U.S.C. § 1915A(b) and § 1915(e)(2)(B).

To state a claim under the Eighth Amendment for denial of adequate medical care, a plaintiff must demonstrate that the defendant exhibited "deliberate indifference" to his "serious medical needs, constituting an unnecessary and wanton infliction of pain." *Easter v. Powell*, 467 F.3d 459, 463 (5th Cir. 2006) (internal citations and quotation marks omitted); *see Estelle v. Gamble*, 429 U.S. 97, 104 (1976).[4] A prisoner must show "objective exposure to a substantial risk of serious harm." *Gobert v. Caldwell*, 463 F.3d 339, 345 (5th Cir. 2006). He also must show that the defendant acted, or failed to act, with deliberate indifference to the risk. *Id*. at 345-46.

---

grievances resolved to his satisfaction. *Stauffer v. Gearhart*, 741 F.3d 574, 587 (5th Cir. 2014); *Geiger*, 404 F.3d at 373-74. Plaintiff was able to file grievances and receive a response from prison officials with written justification for their actions (*see* Dkt. 19-3, at 1-12). The documents in the record therefore indicate that officials complied with due process requirements. *Stauffer*, 751 F.3d at 587.

[4] A "delay in medical care can only constitute an Eighth Amendment violation if there has been deliberate indifference that *results in substantial harm*." *Rogers*, 709 F.3d at 410 (emphasis in original) (internal citation, quotation marks, and alteration omitted).

The deliberate indifference standard has both objective and subjective components. The plaintiff must show that: (1) the prison official was aware of facts from which the inference of an excessive risk to the prisoner's health and safety could be drawn; and (2) the official actually drew that inference. *See Farmer*, 511 U.S. at 837; *Hinojosa v. Livingston*, 807 F.3d 657, 665 (5th Cir. 2015); *Harris v. Hegmann*, 198 F.3d 153, 159 (5th Cir. 1999). Deliberate indifference is an "extremely high standard." *Domino v. Tex. Dep't of Crim. Justice*, 239 F.3d 752, 756 (5th Cir. 2001). It requires "more than an allegation of mere negligence, but less than an allegation of purpose or knowledge." *Hinojosa*, 807 F.3d at 665. Even poor professional judgment or medical malpractice do not rise to the level of "deliberate indifference" necessary to show a constitutional violation. *Harris*, 198 F.3d at 159.

In this case, Plaintiff has failed to allege specific facts that state an Eighth Amendment claim against any of the four medical defendants. Regarding Okeye, Plaintiff's only specific allegation is that Okeye informed Plaintiff on September 30, 2004, that UTMB had refused to repair his cheek or jaw (Dkt. 19, at 2). On this basis, he argues that she was deliberately indifferent to his serious medical need (*id.*). Plaintiff does not allege that Okeye actually made a decision leading to such refusal or to any failure to treat his injuries. He also does not allege any facts supporting a claim that Okeye was aware of, or drew an inference of, an excessive risk to Plaintiff's health. Accepting as true Plaintiff's allegation that Okeye relayed information to him about UTMB's decision regarding his surgery request, this allegation is insufficient to state a claim that Okeye was deliberately indifferent to Plaintiff's serious medical need. *See*

*Delaughter*, 909 F.3d at 136-37 (a defendant's personal involvement is an essential element of a civil rights cause of action, meaning that there must be an affirmative link between the injury and a defendant's conduct); *Hinojosa*, 807 F.3d at 665 (a plaintiff must show that the defendant was aware of facts from which an inference of an excessive risk to the plaintiff's health and safety could be drawn, and that the defendant actually drew such an inference).

As for Defendants Murray and Smock, Plaintiff alleges that they are liable for his failure to undergo the corrective surgery he wanted because of their "decision-making authority" at UTMB (Dkt. 19, at 3-4). Plaintiff otherwise alleges no specific action or omission by either Defendant. Absent personal involvement in a constitutional violation, supervisory liability cannot state a claim for relief under Section 1983. *See Porter v. Epps*, 659 F.3d 440, 446 (5th Cir. 2011); *Rios v. City of Del Rio, Tex.*, 444 F.3d 417, 425 (5th Cir. 2006). Therefore, Plaintiff's claims against Murray and Smock fail.

Finally, regarding the unnamed medical Defendant(s), Plaintiff alleges that the Defendant(s) denied Plaintiff corrective surgery for his cheek and jaw. Plaintiff provides no other specific information in his pleadings, but attaches documents demonstrating that an unnamed ENT doctor treated Plaintiff in October and concluded that surgery was not medically indicated. *See* Dkt. 19-1, at 20 (noting multiple nasal fractures but no visual symptoms and minimal cosmetic deficit and concluding "[n]o repair indicated @ this time"). To the extent Plaintiff seeks to bring an Eighth Amendment claim against this ENT doctor, his claim fails. Plaintiff's disagreement with this this doctor's medical judgment regarding whether surgery was necessary does not state a claim for deliberate

indifference. *See Estelle*, 429 U.S. at 107 (explaining that the decision whether to provide a particular type of treatment "is a classic example of a matter for medical judgment"); *Brauner v. Coody*, 793 F.3d 493, 499 (5th Cir. 2015) (a prisoner's mere disagreement with the medical treatment he received does not state a claim for deliberate indifference); *Stewart v. Murphy*, 174 F.3d 530, 535 (5th Cir. 1999).

For the reasons stated above, Plaintiff's claims against Defendants Okeye, Murray, Smock, and the unnamed medical Defendant(s) are dismissed under 28 U.S.C. § 1915A(b) and 28 U.S.C. § 1915(e)(2)(B) for failure to state a claim upon which relief can be granted.

## IV. <u>CONCLUSION</u>

For the reasons stated above the Court **ORDERS** as follows:

1. Plaintiff's complaint (Dkt. 19) is **DISMISSED** pursuant to 28 U.S.C. § 1915A(b) and § 1915(e)(2)(B) for failure to state a claim upon which relief can be granted.

2. All of Plaintiff's claims are **DISMISSED with prejudice**.

**The Clerk will provide a copy of this Order to the plaintiff and to the Manager of the Three-Strikes List for the Southern District of Texas at Three_Strikes@txs.uscourts.gov**.

SIGNED at Galveston, Texas, this 30th day of April, 2019.

_____
George C. Hanks Jr.
United States District Judge